**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

|  |  |  |
|---|---|---|
| THE SURFRIDER FOUNDATION, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. <u>2:18-cv-00020</u> |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| UNITED STATES STEEL | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## COMPLAINT

Plaintiff, The Surfrider Foundation ("Surfrider"), by and through its attorneys, the

Abrams Environmental Law Clinic at the University of Chicago Law School, hereby files its

Complaint and alleges:

## NATURE OF THE ACTION

1.      This action aims to uphold the objective of the Federal Water Pollution Control

Act, commonly known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.,* to "restore

and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C.

§ 1251(a). Specifically, this action aims to restore and maintain Lake Michigan, which

Defendant, United States Steel Corporation ("U.S. Steel"), has harmed and continues to harm

through repeated and significant violations of its CWA permit limitations and maintenance

failures. These harmful and illegal acts include, but are not limited to, multiple excessive

discharges of toxic chemicals into a body of water that serves as a major source of water for

recreation, drinking, and aquatic life; these illegal discharges occur next to a city park and near

1

the Indiana Dunes National Lakeshore. U.S. Steel has repeatedly evaded responsibility for violating the CWA, and state and federal regulators have failed to enforce the law adequately. This action seeks to hold U.S. Steel responsible for the injuries it has caused to Lake Michigan and those who enjoy and rely on it.

2.      This is a civil action for injunctive relief and civil penalties, brought under Section 505 of the CWA, 33 U.S.C. § 1365, against U.S. Steel for the discharge of pollutants in violation of Section 301 of the CWA, 33 U.S.C. § 1311, and in violation of the National Pollutant Discharge Elimination System ("NPDES") permits issued to U.S. Steel pursuant to Section 402 of the CWA, 33 U.S.C. § 1342. As a result, and as further alleged herein, U.S. Steel has violated the terms and conditions of its NPDES permits and has violated Sections 301(a) and 402(a) of the CWA, 33 U.S.C. §§ 1311(a), 1342(a).

3.      Surfrider seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a)(1), and pursuant to federal question jurisdiction under 28 U.S.C. § 1331.

5.      The relief requested is authorized pursuant to Sections 309 and 505(a) of the CWA, 33 U.S.C. §§ 1319 and 1365(a), and 28 U.S.C. §§ 2201 and 2202.

6.      In compliance with Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), on November 14, 2017, Surfrider gave notice of the violations specified in this Complaint and of Surfrider's intent to file suit to U.S. Steel, the Administrator of the United States Environmental Protection Agency ("USEPA"), the Regional Administrator of USEPA, the United States

Attorney General, the Indiana Department of Environmental Management ("IDEM"), and the Attorney General for the State of Indiana. Surfrider's notice letter meets the requirements of 40 C.F.R. § 135.1 *et seq.* and provided U.S. Steel with notice of the CWA violations in this Complaint. A copy of Surfrider's notice letter is attached hereto as Exhibit A, confirmation of mailing thereof to U.S. Steel's agent for the purposes of service is attached hereto as Exhibit B, and confirmation of receipt is attached hereto as Exhibit C.

7.      More than sixty days have passed since the notice was served, and the violations complained of in the notice letter are continuing at this time or are reasonably likely to continue. U.S. Steel therefore remains in violation of its NPDES permit and the CWA.

8.      Upon information and belief, neither the United States nor the State of Indiana has commenced or is diligently prosecuting a civil or criminal action in any state or federal court to redress the violations alleged herein.

9.      Venue is proper in this District pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), and pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the U.S. Steel facility at issue is located in this District and the causes of the action alleged in this Complaint arose in this District.

## THE PARTIES

### a.  Plaintiff Surfrider

10.      Plaintiff Surfrider is a non-profit corporation with its principal office in San Clemente, California. Surfrider is a national grassroots organization with more than 250,000 supporters and members, 79 local chapters, and 60 school clubs in the United States. Surfrider has four chapters in the Great Lakes region, including its Chicago Chapter. Surfrider's Chicago Chapter currently has more than 125 members, while Surfrider has more than 200 additional

members throughout the Great Lakes region, including in its Lake Michigan, Milwaukee, and Lake Superior Chapters. Surfrider additionally has more than 6,000 supporters in the Great Lakes region who engage with Surfrider's activities and programs by attending Surfrider events, receiving and responding to Surfrider Action Alerts, signing up for Surfrider emails, and following Surfrider Chapters' Facebook pages, among other activities.

11.     Surfrider's mission is the protection and enjoyment of the world's ocean, waves, and beaches. Through its powerful activist network, Surfrider advocates for clean water, ocean protection, coastal preservation, public beach access, and the prevention of marine plastic pollution. Surfrider's vision is to keep beaches open to everyone, promote smart coastal development that avoids coastal impacts, ensure that water is clean for surfing and swimming, keep beaches free of plastic litter, and protect special ocean and coastal places when and before they are threatened. Surfrider's Clean Water Initiative seeks to protect water resources and prevent pollution along coasts and waterways by engaging communities, testing water, planting ocean friendly landscapes, and advocating for holistic clean-water solutions.

12.     The "Southend," the southern coastline of Lake Michigan that borders Northwest Indiana, is one of those special coastal places that Surfrider's Chicago Chapter is engaged in protecting. Lake Michigan provides substantial health, economic, recreational, aesthetic, and environmental benefits to Surfrider's members, who enjoy surfing in Lake Michigan, including in the area adjacent to U.S. Steel's Gary Works – Midwest Plant ("Midwest Plant") at Portage, Indiana.

13.     The Midwest Plant discharges both wastewater and stormwater into Burns Waterway, which empties directly into Lake Michigan. U.S. Steel is responsible for processing its wastewater in accordance with the terms of its NPDES permit No. IN0000337.

4

14.     U.S. Steel's discharges have directly and adversely affected Surfrider's members. Specifically, U.S. Steel's unlawful discharges of chromium and other pollutants harm water quality in Lake Michigan directly where Surfrider members surf. The following image, drawn from GoogleMaps and using longitude and latitude coordinates from U.S. Steel's NPDES permit, depicts the mere feet between U.S. Steel's illegal discharges—principally from its "Outfall 004"—and where surfers and others recreate in and near the water at the Portage Lakefront on Lake Michigan:



15.     The Portage Lakefront draws Surfrider's members primarily for two simple reasons: it has some of the best waves on Lake Michigan, and it is close to where they live in Chicago and Northwest Indiana. Lake surfing depends on wind-powered waves, and when winds funnel down Lake Michigan toward the Southend, the Portage Lakefront offers a rare, high-quality, fresh-water surfing experience. When the wind is right, surfers can get longer lines, more power, bigger faces, and longer rides at the Portage Lakefront. A saying among Southend surfers is "the worse the weather, the better the waves," and surfing in brutally cold and stormy conditions is typical.

16.     Additionally, the Portage Lakefront offers amenities like free parking, public bathrooms, outdoor showers, and a protected break that lets surfers walk out to the water when waves are big. One Surfrider member has surfed at the Portage Lakefront for eight years. He greatly values the park at the Portage Lakefront because, unlike many stretches of beach in the immediate area, it is open to the public and not privately-owned.

17.     From their boards in the water off the Portage Lakefront, surfers can see U.S. Steel's discharges flowing out of its outfalls. Surfers are so close to the Midwest Plant that they use small features of the facility, such as ladders, as landmarks to maintain their bearings. Surfers often enter the water in Burns Waterway and paddle out into the Lake. Other times, they paddle their boards from west to east across the mouth of Burns Waterway, taking them directly through the stream of U.S. Steel's discharges. When they paddle across or through Burns Waterway, or when they are in the Lake waters nearby, Surfrider members often encounter dark-brown discoloration and strong odors, which they variously describe as smelling of metal, sewage, petroleum, or a used ashtray.

18.     Unfortunately, due to concerns about contamination, Surfrider members have frequented the beaches in Portage near U.S. Steel's facility less and less. Some surfers who had previously surfed at the Portage Lakefront have ceased to surf there altogether. For example, one member who surfs Southend beaches surfed at the Portage Lakefront once, and she decided the water was too polluted for her to risk her health by returning. If water quality improved, she would enthusiastically return to the otherwise great surfing conditions there.

19.     When a surfer stops surfing at the Portage Lakefront, he or she can lose some of the strong sense of community that is important to those who surf in the Southend. One Surfrider member notes that, with more surfers refusing to return to the Portage Lakefront due to concerns with contamination, he more frequently surfs there alone now, making his experience more solitary and less safe.

20.     Some Surfrider members have experienced serious health issues after surfing at the Portage Lakefront and other nearby Southend beaches. Surfers periodically suffer from bloodshot, itchy, or infected eyes, a choked-up feeling in their throats, sore throats, nausea, blocked nasal passages, ear infections, and flu-like symptoms. Some have experienced unusual medical conditions for their age and gender that their doctors are unable to explain, including a surfer in his thirties who suffered from shingles in his eye and two male surfers with urinary tract infections. One of the male surfers went to the emergency room with a urinary tract infection; later he had a second urinary tract infection that became septic and led to a kidney infection and pneumonia. Another surfer's male dog contracted a urinary tract infection after submerging himself in the water. Some surfers also experience dermatitis (i.e. skin itchiness and irritation) if they don't shower very soon after surfing at the Portage Lakefront.

21.     Many surfers worry about the serious health risks of pollution after suffering themselves or hearing stories from friends, and these concerns prevent them from using and enjoying the beach at Portage as much as they would like. One surfer who still surfs at the Portage Lakefront only does so when he has not had a chance to surf in a long time, and he refuses to take his family to that beach.

22.     Some Surfrider members persist in following their passion at Portage, but they constantly worry about their own health and that of the Lake ecosystem that many of them have enjoyed since childhood.

23.     Surfrider members who live in Chicago and Northwest Indiana and whose drinking water comes from Lake Michigan are also concerned by the threat to public drinking water sources posed by U.S. Steel's illegal discharges.

24.     In addition, Surfrider members are deeply concerned about the damage being done to these beloved natural places and landscapes by U.S. Steel's illegal discharges. While some parts of the Southend scenery may be gritty and industrial, members have a deep appreciation for the natural beauty of the dunes and the Lake. One surfer notes that if one looks straight out at the Lake and not at the factories at the sides, the landscape looks like a tropical paradise. Another member cherishes the quiet reprieve and feeling of calmness she feels when visiting Lake Michigan and the nearby Indiana Dunes National Lakeshore.

25.     Surfrider members feel passionately about conservation and working to preserve the health of the lakeshore, and they feel these aims are thwarted when companies violate the CWA. Many members feel a responsibility to protect the freshwater ecosystems that they love to visit and surf. Surfrider members pick trash up off the beaches, either in organized clean-up

events or on their own, and they take pride that their sport leaves no impact on the waters they use.

26.     Another interest at stake involves when and how Surfrider members and others in the public are notified of U.S. Steel's illegal discharges of pollution. So that they can make more informed decisions and avoid exposure to U.S. Steel's illegal discharges, surfers have a concrete interest in U.S. Steel notifying them and the public when the company discharges illegally into waters that flow into Lake Michigan.

27.     U.S. Steel's discharges and other violations alleged herein have affected adversely and continue to affect adversely Surfrider's members' above-described use and enjoyment of Lake Michigan and Burns Waterway, as well as their interest in their health.

28.     U.S. Steel's discharges adversely affect Surfrider's organizational purposes by degrading waters where its members surf and impairing the habitability, recreational value, and aesthetic beauty of the waters that Surfrider strives to protect and make accessible to all recreators.

29.     The harms that Surfrider members experience are directly traceable to the failures of U.S. Steel to comply with the terms of its NPDES permit.

30.     The relief from the Court sought herein would redress the impairment of the health, economic, recreational, aesthetic, and environmental interests of Surfrider and its members and supporters, as well as members of the public who enjoy and rely on the Lake both for recreation and as a source of drinking water. The Court should enjoin U.S. Steel from further discharges in violation of law and require U.S. Steel to take expeditiously all actions necessary to control its illegal discharges. In addition, the Court should impose a significant monetary penalty to ensure that U.S. Steel enjoys no economic benefit from the practices that led to these repeated

violations and to serve as a meaningful deterrent for a company as large as U.S. Steel. Thereby, U.S. Steel would control its discharges of chromium and other pollutants as required by law, improving the quality of the water used by Surfrider members and the public, addressing concerns that cause some members of Surfrider and of the public not to use the waters, and protecting their continued, increased, and improved use and enjoyment of Lake Michigan.

31.     The requested relief herein would not require Surfrider member participation in any respect.

**b. Defendant U.S. Steel**

32.     Defendant U.S. Steel is a corporation registered in the state of Delaware. U.S. Steel owns and operates a steel refinery known as the United States Steel Corporation, Gary Works – Midwest Plant at 6300 U.S. Highway 12, Portage, IN 46368. The Midwest Plant is located on Burns Waterway, a small industrial ditch, into which the facility discharges both wastewater and stormwater, and which empties directly into Lake Michigan. U.S. Steel is responsible for processing its wastewater in accordance with the terms of its NPDES permit No. IN0000337.

**STATUTORY AND REGULATORY BACKGROUND**

**a. The CWA's Citizen Suit Provisions**

33.     Surfrider and U.S. Steel are "persons" pursuant to Section 502 of the CWA, 33 U.S.C. § 1362(5), which defines "person" as "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body."

34.     Surfrider and its members are "citizens" pursuant to Section 505 of the CWA, 33 U.S.C. §§ 1365(a) and 1365(g), because they are "persons having an interest which is or may be adversely affected" by U.S. Steel's illegal discharges.

35.     U.S. Steel may be sued pursuant to Section 505 of the CWA, 33 U.S.C. § 1365(a), which authorizes any citizen to "commence a civil action . . . against any person . . . who is alleged to be in violation of an effluent standard or limitation." "[T]he term 'effluent standard or limitation'" includes "a permit or condition thereof issued under section 1342 of this title." 33 U.S.C. § 1365(f).

**b.  The CWA's NPDES Program**

36.     The purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

37.     Section 101(a)(3) of the CWA prohibits "the discharge of toxic pollutants in toxic amounts." 33 U.S.C. § 1251(a)(3).

38.     Section 301 of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person" into navigable waters except in compliance with a NPDES permit issued by the USEPA or an authorized state administrator pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

39.     At all times relevant to this complaint, IDEM has been and continues to be authorized by the USEPA to implement the NPDES permit program for discharges into navigable waters within its jurisdiction pursuant to 40 C.F.R. § 123.1.

40.     Section 502 of the CWA defines "navigable waters" as "waters of the United States." 33 U.S.C. § 1362(7).

41.     Under Section 502 of the CWA, the term "discharge of a pollutant" includes "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

42.     Section 502 of the CWA defines "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

43.     Section 502 of the CWA defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

44.     Section 402 of the CWA, 33 U.S.C. § 1342(a), provides that a permit-issuing authority may "issue a [NPDES] permit for the discharge of any pollutant" into navigable waters of the United States, but only in compliance with the applicable requirements of Section 301 of the CWA, 33 U.S.C. § 1311, and such other conditions as the permit-issuing authority determines are necessary to carry out the provisions of the CWA.

45.     NPDES permits establish "effluent limitations," which are defined as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters." 33 U.S.C. § 1362(11).

46.     Section 308 of the CWA, 33 U.S.C. § 1318, requires NPDES permittees to establish and maintain records; to install, use and maintain monitoring equipment; to sample effluents; and to "make such reports" as required in the permit regarding permittees' pollutant discharges.

47.     Section 402(a)(2) of the CWA, 33 U.S.C. § 1342(a)(2), authorizes the Administrator to "prescribe conditions for [NPDES] permits to assure compliance . . . including conditions on data and information collection, reporting, and such other requirements as he deems appropriate."

48.     Failure to comply with any condition of a permit is a violation of Section 301 of the CWA, 33 U.S.C. § 1311, and is actionable under Section 505 of the CWA, 33 U.S.C. § 1365(a)(1).

**c.  Judicial Relief in CWA Citizen Suits**

49.     Section 505 of the CWA authorizes the district courts "to enforce such an effluent standard or limitation . . . and to apply any appropriate civil penalties under section 1319(d)" in suits filed by citizens pursuant to 33 U.S.C. § 1365(a).

50.     Section 309 of the CWA, 33 U.S.C. § 1319(d), provides that "any person" who violates Section 301 of the CWA, 33 U.S.C. § 1311, or violates any permit condition or limitation in an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, "shall be subject to a civil penalty."

51.     Pursuant to Attachment 1 to USEPA's *Interim Clean Water Act Settlement Penalty Policy*, each exceedance of a daily effluent limitation shall be treated as a distinct violation, and each exceedance of a monthly average limit shall be treated as a violation for every day in the month in which the violation occurred.

52.     Per the Federal Civil Penalties Inflation Adjustment Act, as amended by the Debt Collection Improvement Act, each separate violation of the CWA subjects the violator to a penalty of up to $37,500 per day per violation for all violations occurring from January 12, 2009 through November 2, 2015, and up to $52,414 per day for all violations that occurred after

November 2, 2015, pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. §§ 19.1-19.4. *See also* 28 U.S.C. § 2461, 31 U.S.C. § 301.

53.     Under the citizen suit provision of the CWA, Section 505, the court may also award "costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party." 33 U.S.C. § 1365(d).

## GENERAL ALLEGATIONS

54.     At all times relevant to this complaint, U.S. Steel has owned and operated the Midwest Plant, a steel refinery, in Portage, Indiana, which is located in Porter County. The Midwest Plant discharges wastes from its operation or otherwise through a point source into Burns Waterway pursuant to NPDES permit No. IN0000337.

55.     U.S. Steel discharges wastewater into Burns Waterway a few hundred feet from where waters flowing from Burns Waterway enter Lake Michigan.

56.     U.S. Steel has repeatedly violated pollutant-discharge and maintenance provisions in its permit during the past five years.

57.     In April 2017, a broken pipe or pipes and a corroded collection trough or troughs resulted in a spill of approximately 350 pounds of total chromium, of which nearly 300 pounds was carcinogenic hexavalent chromium.

58.     According to public reports, this spill began on April 10, 2017 and continued into April 11, 2017. Under USEPA oversight, U.S. Steel collected water samples on April 11th that showed levels of hexavalent chromium that were (i) hundreds of times greater than standards set to be protective of human health in Burns Waterway and (ii) more than double those standards at the point where Burns Waterway flows into Lake Michigan. Nonetheless, it appears that no samples were collected in Lake Michigan itself until April 12, 2017.

59.     According to IDEM reports, U.S. Steel failed to notify any downstream users of the waters affected by the April 2017 chromium spill.

60.     In response to U.S. Steel's April 2017 chromium spill, numerous public beaches were closed for several days, including the Portage Lakefront and the Indiana Dunes National Lakeshore.

61.     Additionally, the public drinking water intake of Indiana American Water, serving the City of Portage, ceased drawing Lake Michigan water and remained shut down for nearly a week. The City of Chicago reported that its drinking water intake located in Lake Michigan approximately 20 miles away from the Midwest Plant detected elevated levels of hexavalent chromium after U.S. Steel's April spill.

62.     Prior to U.S. Steel's April 2017 chromium spill, it had violated the chromium discharge limits set in its permit on at least two separate occasions in the preceding five years, including in January 2017.

63.     After the chromium spill in April 2017, U.S. Steel again illegally discharged an excessive amount of chromium in October 2017. Despite a third-party contractor working for U.S. Steel observing a blue discharge with visible solids, U.S. Steel did not test to see how much of the total chromium discharged was comprised of the more toxic hexavalent chromium.

64.     U.S. Steel did not notify anyone who might or actually did use Lake Michigan for recreation, drinking water, or other purposes of its October 2017 illegal chromium discharge. Instead, U.S. Steel notified only IDEM, and the company's written report requested that IDEM treat as confidential the information about the October 2017 discharge.

65.     The weekend following U.S. Steel's October 2017 illegal chromium discharge, surfing conditions on the Southend were among the best of the year. Surfrider members were

surfing on the Southend that weekend and surfers were at Portage Lakefront, without any awareness of U.S. Steel's illegal discharge.

66.     IDEM did not conduct an accident inspection related to the October 2017 incident until approximately three weeks later, on November 16—after Surfrider sent its Notice of Intent to Sue.

67.     According to public reports, neither U.S. Steel nor IDEM officials notified USEPA of the October exceedance. The Chicago Tribune reported that USEPA only learned of the October 2017 incident when a Tribune reporter requested USEPA's comment for an article on U.S. Steel's persistent CWA violations and Surfrider's Notice of Intent to Sue.

## VIOLATIONS OF QUANTITATIVE PERMIT LIMITS

68.     NPDES Permit No. IN0000337 places limits on the quantity and concentration of pollutants that U.S. Steel is legally permitted to discharge into Burns Waterway through Outfalls 004, 204, 304, and 500 by setting effluent limitations for Total Recoverable Chromium, Hexavalent Chromium, Whole Effluent Toxicity, Oil and Grease, and Temperature, as well as other pollutants.

69.     One version of NPDES Permit No. IN0000337 was in effect from March 1, 2011 to February 28, 2016 ("2011 permit"). U.S. Steel renewed NPDES permit No. IN0000337 in 2016, which came into effect on April 1, 2016 and will remain in effect until March 31, 2021 ("2016 permit"). The 2011 permit is attached hereto as Exhibit D. The 2016 permit is attached hereto as Exhibit E. At all times relevant to this complaint, U.S. Steel's NPDES permit No. IN0000337 remained in effect, and the effluent limitations for the pollutants listed in ¶ 97 remained unchanged.

16

70.     NPDES Permit No. IN0000337 describes Outfalls 004, 204, 304, and 500 at the U.S. Steel Midwest Plant, each of which are "point source[s]" within the meaning of Section 502 of the CWA, 33 U.S.C. § 1362(14). These outfalls are "point source[s]" within the meaning of Section 502 of the CWA because they are pipes from which pollutants are discharged into Burns Waterway.

71.     Pursuant to Part I.C.2 of NPDES permit No. IN0000337, U.S. Steel is required to "submit federal and state discharge monitoring reports to the Indiana Department of Environmental Management containing results obtained during the previous month . . . no later than the 28th day of the month following each completed monitoring period."

72.     Pursuant to Part II.C.6.c of NPDES permit No. IN0000337, U.S. Steel is required to certify upon signing the monthly reports that the information is "to the best of [the signer's] knowledge and belief, true, accurate, and complete."

73.     U.S. Steel's monthly Discharge Monitoring Reports ("DMRs") report chronic and frequent violations of NPDES permit No. IN0000337. According to DMRs that U.S. Steel filed within the five-year statute of limitations period for CWA claims, and pursuant to USEPA guidance on civil penalties, U.S. Steel has a total of ninety violations of its effluent limitations for Total Recoverable Chromium, Hexavalent Chromium, Whole Effluent Toxicity, Oil and Grease, and Temperature.

74.     Specifically, U.S. Steel self-reported violations of the following pollutants within the five-year statute-of-limitations period:

<u>TOTAL RECOVERABLE CHROMIUM</u>

75.     Chromium is a "pollutant" as defined by Section 502 of the CWA, 33 U.S.C. § 1362(6).

76.      Total chromium includes both trivalent and hexavalent forms of chromium because it can convert between forms under different conditions. Hexavalent chromium, also known as chromium-6, has been linked to cancer in studies. In addition, the USEPA website states that "continued exposure to chromium-6 could result in allergic dermatitis (skin reactions)."

77.     Both the 2011 permit and the 2016 permit contain a daily maximum quantity limit of 30 pounds per day of total recoverable chromium discharged from Outfall 304. The 2016 permit imposes a monthly average rate of 10 pounds per day of total recoverable chromium discharged from Outfall 304.

78.     According to U.S. Steel's DMRs, U.S. Steel exceeded its (i) daily maximum quantity limit for total recoverable chromium four times within the five-year statute of limitations period and (ii) the monthly average rate for total recoverable chromium one time within the five-year statute of limitations period, for a total of thirty-four days in violation according to the calculation method in the USEPA guidance on civil penalties. *See* ¶ 97.

<u>HEXAVALENT CHROMIUM</u>

79.     Hexavalent chromium is a "pollutant" as defined by Section 502 of the CWA, 33 U.S.C. § 1362(6).

80.      Hexavalent chromium has been linked to cancer in studies. Also, the USEPA website states that "continued exposure to chromium-6 could result in allergic dermatitis (skin reactions)."

81.     Both the 2011 permit and the 2016 permit contain a daily maximum quantity limit of 0.51 pounds per day of hexavalent chromium discharged from Outfall 304. The 2016 permit imposes a monthly average rate of 0.17 pounds per day of hexavalent chromium discharged from Outfall 304.

82.     According to U.S. Steel's DMRs, U.S. Steel exceeded (i) its daily maximum quantity limit for hexavalent chromium three times within the five-year statute of limitations period and (ii) the monthly average rate for hexavalent chromium one time within the five-year statute of limitations period, for a total of thirty-three days in violation according to the calculation method in the USEPA guidance on civil penalties. *See* ¶ 97.

WHOLE EFFLUENT TOXICITY

83.     Both the 2011 permit and the 2016 permit require U.S. Steel to conduct quarterly bioassay tests on model organisms to monitor the toxicity of the discharge from Outfall 004. If the effluent exceeds 1.5 chronic toxicity units (TUc) during the tests on *Ceriodaphnia dubia*, this is considered to demonstrate chronic toxicity and constitutes a failure of the toxicity test.

84.     Section 101(a)(3) of the CWA prohibits the discharge of "toxic pollutants in toxic amounts." 33 U.S.C. § 1251(a)(3).

85.     According to U.S. Steel's DMRs, U.S. Steel failed the quarterly toxicity test on *C. dubia* three times during the five-year statute of limitations period for a total of three violations. *See* ¶ 97.

TEMPERATURE

86.     Heat is a "pollutant" as defined by Section 502 of the CWA, 33 U.S.C. § 1362(6).

87.     USEPA's *Analysis and Control of Thermal Pollution Training Manual* states that even "temperatures which are not lethal to fish or shellfish may affect metabolism, reproduction

19

and growth, as well as reduce important food organisms, thereby inducing a change in the balance of the entire system."

88. All temperature limits are for Outfall 500, which measures the "combined effect of the [thermal] effluent from Outfalls 002, 003 and 004." Both the 2011 permit and the 2016 permit mandate that "there shall be no rise in the temperature of the Portage-Burns Waterway of greater than 2°F, as determined from upstream temperature and downstream temperature at the edge of the mixing zone." The 2016 permit defines the "mixing zone" as "the area of Portage-Burns Waterway extending laterally from Outfall 002 to one-half the width of Portage-Burns Waterway and to a distance of 300 feet downstream of Outfall 004."

89. Both the 2011 permit and the 2016 permit mandate that during the months of December through March, the downstream temperature at the edge of the mixing zone may not exceed the maximum limit for the month by more than 3°F at any time. The relevant monthly maximums are: 57°F in December, 50°F in January, 50°F in February, and 60°F in March.

90. During the months of April through November, the downstream temperature may not exceed the limit for each month (subject to the below exceptions). For April, May, September, October, and November, the limit for each month is 65°F; for June, July, and August, the limit for each month is 70°F.

91. The 2011 permit allows an exception to the above April-through-November limits when the upstream temperature equals or exceeds the maximum limitation for that day. The 2016 permit allows an exception to the above April-through-November limits when "the upstream temperature is within 2°F of the maximum limitation for that day." This exception in the 2016 permit allows for downstream temperatures to exceed the limit for the month so long as the downstream temperature is within 2°F of the maximum limit for that day.

92.     According to U.S. Steel's DMRs, U.S. Steel exceeded the applicable daily-maximum downstream-temperature limit for Outfall 500 sixteen times, when no exception applied, within the five-year statute-of-limitations period. It also exceeded the daily-maximum receiving-water temperature-difference limit for Outfall 500 three times within the five-year statute-of-limitations period. Thus U.S. Steel had a total of nineteen temperature violations within the five-year statute-of-limitations period. *See* ¶ 97.

OIL AND GREASE

93.     Oil and grease are "pollutants" as defined by Section 502 of the CWA, 33 U.S.C. § 1362(6).

94.     The USEPA website states that petroleum and non-petroleum oils can "cause devastating physical effects, such as coating animals and plants with oil and suffocating them by oxygen depletion; be toxic and form toxic products; destroy future and existing food supplies, breeding animals, and habitats; produce rancid odors; foul shorelines, clog water treatment plants, and catch fire when ignition sources are present; and form products that linger in the environment for many years."

95.     Both the 2011 permit and the 2016 permit contain a daily maximum-quantity limit of 765 pounds per day of oil and grease discharged from Outfall 304.

96.     According to U.S. Steel's DMRs, U.S. Steel exceeded its daily maximum-quantity limit for oil and grease one time within the five-year statute-of-limitations period for a total of one violation. *See* ¶ 97.

TABLE OF QUANTITATIVE LIMIT VIOLATIONS

97.   Each row of the following table sets forth an individual violation by U.S. Steel of a numeric permit violation, by describing the discharge type, violation date(s), outfall, measured value, allowance type, and relevant permit allowance.

| Discharge Type | Date(s) of Violation | Outfall | Measured Value | Type of Allowance | Permit Allowance |
|---|---|---|---|---|---|
| Chromium, Total Recoverable | 02/03/2013 | 304A | 36.17 pounds per day (lbs/day) | Daily maximum | 30 lbs/day |
| Whole Effluent Toxicity, Chronic – C. dubia | Week of 08/04/2013 | 004 | 2.0 TUc | Quarterly maximum | 1.5 TUc (100/IC25) |
| Temperature, Downstream | 05/26/2014 | 500A | 65.66°F | Daily maximum | 65°F |
| Temperature, Downstream | 05/27/2014 | 500A | 65.37°F | Daily maximum | 65°F |
| Temperature, Downstream | 05/29/2014 | 500A | 66.25°F | Daily maximum | 65°F |
| Whole Effluent Toxicity, Chronic – C. dubia | Week of 06/08/2014 | 004 | 2.9 TUc (100/NOEC) / 2.3 TUc (100/IC25) | Quarterly maximum | 1.5 TUc (100/NOEC) / 1.5 TUc (100/IC25) |
| Whole Effluent Toxicity, Chronic – C. dubia | Week of 06/22/2014 | 004 | 2.9 TUc (100/NOEC) / 1.6 TUc (100/IC25) | Quarterly maximum | 1.5 TUc (100/NOEC) / 1.5 TUc (100/IC25) |
| Temperature, Downstream | 06/02/2014 | 500A | 71.11°F | Daily maximum | 70°F |
| Temperature, Downstream | 06/03/2014 | 500A | 70.64°F | Daily maximum | 70°F |
| Temperature, Downstream | 09/15/2014 | 500A | 66.65°F | Daily maximum | 65°F |
| Temperature Difference Receiving Water | 10/01/2014 | 500A | 7.55°F | Daily rise | 2°F |
| Temperature, Downstream | 10/02/2014 | 500A | 66.73°F | Daily maximum | 65°F |

| Oil & Grease | 03/19/2015 | 304A | 848 lbs/day | Daily maximum | 765 lbs/day |
|---|---|---|---|---|---|
| Temperature, Downstream | 10/07/2015 | 500A | 65.6°F | Daily maximum | 65°F |
| Temperature, Downstream | 10/08/2015 | 500A | 65.6°F | Daily maximum | 65°F |
| Temperature, Downstream | 10/09/2015 | 500A | 65.1°F | Daily maximum | 65°F |
| Temperature, Downstream | 10/10/2015 | 500A | 65.4°F | Daily maximum | 65°F |
| Temperature, Downstream | 10/22/2015 | 500A | 65.7°F | Daily maximum | 65°F |
| Temperature, Downstream | 10/23/2015 | 500A | 65.5°F | Daily maximum | 65°F |
| Temperature Difference Receiving Water | 09/07/2016 | 500A | 2.1°F | Daily rise | 2°F |
| Temperature Difference Receiving Water | 11/02/2016 | 500A | 2.1°F | Daily rise | 2°F |
| Chromium, Hexavalent | 01/12/2017 | 304A | 2.371 lbs/day | Daily maximum | 0.51 lbs/day |
| Temperature, Downstream | 02/26/2017 | 500A | 53.35°F | Daily maximum | 50°F |
| Temperature, Downstream | 02/27/2017 | 500A | 53.93°F | Daily maximum | 50°F |
| Temperature, Downstream | 02/28/2017 | 500A | 54.54°F | Daily maximum | 50°F |
| Chromium, Total Recoverable | 04/10/2017 | 304A | 138.8 lbs/day | Daily maximum | 30 lbs/day |
| Chromium, Total Recoverable | 04/11/2017 | 304A | 204.0 lbs/day | Daily maximum | 30 lbs/day |
| Chromium, Total Recoverable | April 2017 | 304A | 13.97 lbs/day | Monthly average maximum | 10 lbs/day |
| Chromium, Hexavalent | 04/11/2017 | 304A | 902.8 lbs/day | Daily maximum | 0.51 lbs/day |
| Chromium, Hexavalent | 04/12/2017 | 304A | 1.782 lbs/day | Daily maximum | 0.51 lbs/day |
| Chromium, Hexavalent | April 2017 | 304A | 50.26 lbs/day | Monthly average maximum | 0.17 lbs/day |

| Chromium, Total Recoverable | 10/25/2017 | 304A | 56.7 lbs/day | Daily Maximum | 30 lbs/day |
|---|---|---|---|---|---|

98.     The February 3, 2013 Total Recoverable Chromium violation reflects the amount reported by U.S. Steel in the narrative cover letter it appended to its DMR submission. The DMR data that U.S. Steel reported for this day was 34.37 lbs/day, which would also violate the relevant permit limit.

99.     The April 11, 2017 Hexavalent Chromium figure was submitted by U.S. Steel in its April 2017 DMR. U.S. Steel staff attested to the accuracy of this figure in certifying its submission. Nonetheless, U.S. Steel stated in a footnote that this figure represented "an absurd result" of the mathematical formula required by the permit. According to other reports U.S. Steel submitted to IDEM, during April 11 and 12, 2017, the facility released a total of approximately 346 pounds of total chromium, approximately 298 pounds of which was hexavalent chromium.

## NARRATIVE WATER QUALITY PERMIT CONDITION VIOLATIONS

100.     Pursuant to Part I.B. in both the 2011 permit and the 2016 permit, U.S. Steel is required to follow certain "Narrative Water Quality Standards." These standards mandate that the Midwest Plant's "[d]ischarge … shall not cause receiving waters, including the mixing zone, to contain substances, materials, floating debris, oil, scum or other pollutants … that are in amounts sufficient to be unsightly or deleterious … [or] that produce color, visible oil sheen, odor, or other conditions in such degree as to create a nuisance." The discharge must also not be "in amounts sufficient to be acutely toxic to, or to otherwise severely injure or kill aquatic life, or other animals, plants, or humans." Outside the mixing zone, the discharge must not contain "substances in concentrations which … are believed to be sufficient to injure, be chronically

toxic to, or be carcinogenic, mutagenic, or teratogenic to humans, animals, aquatic life, or plants."

101.    Upon information and belief, U.S. Steel has violated the Narrative Water Quality Standards in its permit. On the morning of April 11, 2017, U.S. Steel reported a bluish-green color in the effluent from Outfall 004. Photographs from that morning show substantial discoloration of effluent.

102.    Additionally, as reported in the relevant monthly DMRs and other reports made by U.S. Steel to IDEM, effluent discoloration was also observed one time in December 2013 and two times in April 2016. In all three cases prior to the April 2017 chromium incident, U.S. Steel reported white or cloudy discoloration observed at Outfall 004, and in all three cases, IDEM noted these events as violations.

103.    Upon information and belief, the April 2017 discharge of hexavalent chromium also constitutes a violation of the permit condition forbidding water "outside the mixing zone, to contain substances in concentrations which on the basis of available scientific data are believed to be sufficient to injure, be chronically toxic to, or be carcinogenic, mutagenic, or teratogenic to humans, animals, aquatic life, or plants." The USEPA's Final Removal Report for this incident describes observed concentrations of hexavalent chromium outside of the mixing zone as potentially harmful to human health.

## VIOLATIONS OF PERMIT CONDITIONS REQUIRING PROPER MAINTENANCE AND APPROPRIATE RESPONSES TO DISCHARGE VIOLATIONS

104.    Pursuant to the 2016 permit, U.S. Steel "shall at all times maintain in good working order and efficiently operate all facilities and systems . . . for the collection and treatment which are installed or used by the permittee and which are necessary for achieving compliance with the terms and conditions of this permit."

105.     Based on publicly available data, U.S. Steel failed to meet maintenance obligations required by the permit. Photographs taken immediately after the April 2017 spill show extensive corrosion that allowed for the unpermitted discharge of chromium into Burns Waterway.

106.     The IDEM inspection report following the April 2017 incident rated the facility's "Operations and Maintenance" as "unsatisfactory" because of the equipment failure that led to the re-routing of toxic wastewater. Additionally, IDEM's post-incident inspection rated "flow measurement" as "marginal" due to potential obstructions in the channels of two of the facility's outfalls.

107.     In February 2013, U.S. Steel attributed its excessive chromium discharge to control malfunctioning.

108.     In March 2015, the Midwest Plant exceeded its permitted levels of oil and grease discharge because a loss of oil-processing capabilities led, according to U.S. Steel's report, to "accumulation" of oil "during the week prior" that was either not detected or inadequately addressed.

109.     In two separate but related incidents in April 2016, leaking oil was not properly contained and mingled with non-contact cooling water, leading to the discharge of untreated oil-contaminated water.

110.     In October 2017, U.S. Steel discharged almost twice as much total chromium as its permit allows. According to U.S. Steel's report, a technician reported that a daily 24-hour composite sample for Outfall 204 was "discolored." Subsequent investigation revealed that flow through a lamella clarifier was not uniform "due to heavier solids buildup on one side of the lamella, and as a result there was excessive solids carryover."

111.    According to IDEM, the technician discovered the October 2017 total chromium violation when, in the course of conducting routine sampling at Outfall 204, the technician observed that the discharge was "blue with visible solids."

112.    Pursuant to the 2016 permit, in the event of an unauthorized release or discharge, including any spill, leak or discharge of non-stormwater not authorized by the permit, U.S. Steel must "take all reasonable steps to minimize or correct any adverse impact to the environment resulting from noncompliance with [the] permit," including by conducting accelerated or additional monitoring to determine the nature and impact of the noncompliance.

113.    According to IDEM, U.S. Steel failed to take reasonable steps to minimize or correct the October 2017 illegal total chromium discharge because U.S. Steel failed to perform monitoring necessary to determine how much of that illegal discharge was comprised of hexavalent chromium. IDEM described such monitoring as necessary because the discharge was "blue with visible solids."

114.    These documented maintenance failures indicate a pervasive and persistent failure by U.S. Steel to maintain the Midwest Plant in good working order as necessary to comply with the limitations and conditions of its NPDES permit.

115.    Upon information and belief, U.S. Steel's failure in performing its maintenance responsibilities at the Midwest Plant are not limited to the single days on which the above consequences of such failures were observed. These observed and reported incidents indicate that U.S. Steel continues not to maintain properly the Midwest Plant.

## REPORTING AND MONITORING VIOLATIONS

116.    Both the 2011 permit and the 2016 permit contain conditions that impose various reporting and monitoring obligations upon U.S. Steel.

117.    Pursuant to Part III.A.8 of both the 2011 permit and the 2016 permit, U.S. Steel is required to list the calculated temperature difference between the daily maximum upstream and daily maximum downstream temperature.

118.    Pursuant to Special Condition [5] to Parts I.A.4–5 of the 2016 permit, U.S. Steel is required to submit a certification statement in lieu of quarterly monitoring for Total Toxic Organics.

119.    Pursuant to Part I.A.7 of the 2011 permit, U.S. Steel is required to conduct quarterly monitoring of stormwater runoff from Outfalls 001, 102, and 103. Per Special Condition [3], U.S. Steel is allowed to conduct the sampling during any month in the quarter, but "the result from this reporting timeframe shall be reported on the [quarterly final month] DMR, regardless of which of the months within the quarter the sample was taken."

120.    Pursuant to Parts I.A.4–5 of the 2016 permit, U.S. Steel is required to monitor the pollutants Total Cyanide, Total Recoverable Zinc, Total Recoverable Chromium, Total Suspended Solids, and Oil & Grease five times per week for Outfalls 204 and 304.

121.    Each row in the following table represents an individual violation by U.S. Steel of a reporting or monitoring requirement in the 2011 permit or the 2016 permit, by setting forth the discharge type, date(s) of violation, outfall, description of the violation, and the type of violation:

| Discharge Type | Date(s) of Violation | Outfall | Description of Violation | Type of Violation |
|---|---|---|---|---|
| | December 2012 | | No quarterly testing was conducted in this month | Not conducted as required |
| | June 2013 | | Required quarterly testing data missing | Not reported as required |

28

| Temperature | 10/01/2014 | 500A | 7.55 °F temperature difference reported as a 2 °F difference | Incorrectly calculated temperature difference |
|---|---|---|---|---|
| Temperature | 01/06/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/07/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/09/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/10/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/15/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/16/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/20/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/21/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/22/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 04/23/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 04/24/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 06/07/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 06/09/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 06/22/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 06/26/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 06/28/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 08/19/16 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 08/20/16 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 08/21/16 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Total Toxic Organics | October 2016 | | Missing Total Toxic Organic Certification | |

| Total Suspended Solids, Oil & Grease, Cyanide, Zinc, and Chromium | December, 2016 | 204A, 304A | Inadequate monitoring frequency (should be 5/week)

* Note: This constitutes ten independent monitoring violations as each pollutant must be monitored at each outfall. | 5 days in a row without tests (6 days in a row without a test for cyanide) |

122.    Every instance in which U.S. Steel violated its obligation to report accurately the temperature difference involved U.S. Steel under-reporting the temperature difference, including one time in which it reported a 7.55°F temperature difference as a 2°F difference.

### STORMWATER ROUTING VIOLATIONS

123.    Pursuant to the 2016 permit, certain stormwater management practices that the 2011 permit authorized are currently disallowed. Specifically, the 2016 permit no longer allows Outfall 004 to discharge stormwater runoff, whereas the 2011 permit allowed for stormwater discharges to be routed through Outfall 004.

124.    The fact sheet attached to the 2016 permit indicates that Outfall 004 continues to handle stormwater runoff from over twenty-five acres of industrial property. If the Midwest Plant is continuing to route stormwater through Outfall 004, then U.S. Steel has been committing ongoing permit violations every day—or at least every rainy day on which it has discharged stormwater—since the issuance of the 2016 permit.

125.    In sum, the allegations in this Complaint are based on publicly available information. Additional information, including information in U.S. Steel's possession, may reveal additional violations, and Surfrider expressly reserves the right to amend this Complaint to reflect, or to otherwise introduce evidence of, any additional violations discovered hereafter through discovery in this litigation or otherwise.

## FIRST CLAIM FOR RELIEF

### Pollutant Discharges in Violation of the Permit and the CWA

126.    Paragraphs 1 through 125 are realleged and incorporated herein by reference.

127.    At all times relevant to this complaint, U.S. Steel has discharged and continues to "discharge" "pollutants" within the meaning of Section 502 of the CWA, 33 U.S.C. § 1362, into Burns Waterway.

128.    U.S. Steel's pollutant discharges are discharges from a "point source" into "navigable waters" of the United States within the meaning of Section 502 of the CWA, 33 U.S.C. § 1362.

129.    Burns Waterway and Lake Michigan are "navigable waters" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

130.    Between November 13, 2012 and November 13, 2017, U.S. Steel self-reported ninety violations of the effluent limitations contained in its permit, as counted based on the USEPA guidance on civil penalties. *See* ¶ 97. These ninety violations included excessive discharges of Total Recoverable Chromium, Hexavalent Chromium, Oil & Grease, and Temperature and violations of Whole Effluent Toxicity standards.

131.    Each of U.S. Steel's ninety permit violations constitutes a violation of Section 301 of the CWA, 33 U.S.C. § 1311, and is actionable under Section 505 of the CWA, 33 U.S.C. § 1365(a)(1).

132.    Based on U.S. Steel's ongoing violations of its permit, U.S. Steel will continue to discharge in violation of Section 301 of the CWA, 33 U.S.C. § 1311, unless at lenjoined by this Court.

133.    Pursuant to Sections 309 and 505 of the CWA, 33 U.S.C. §§ 1319 and 1365, and 40 C.F.R. §§ 19.1-19.4, U.S. Steel is liable for injunctive relief and civil penalties of up to $37,500 per day for each of the nineteen violations occurring from January 12, 2009 through November 2, 2015 and $52,414 per day for each of the seventy-one violations occurring after November 2, 2015. 33 U.S.C. §§ 1311, 1365; 40 C.F.R. §§ 19.1-19.4.

## SECOND CLAIM FOR RELIEF

### Violations of Narrative Water Quality Standards in the Permit and the CWA

134.    Paragraphs 1 through 133 are realleged and incorporated herein by reference.

135.    Part I.B in both the 2011 permit and the 2016 permit prohibit U.S. Steel from violating certain "Narrative Water Quality Standards." *See* ¶ 100.

136.    U.S. Steel has violated the Narrative Water Quality Standards in its permit on at least four occasions according to U.S. Steel's DMRs for the months covering April 2017, December 2013, and April 2016 (describing two violations). *See* ¶¶ 101–103.

137.    Each of U.S. Steel's four narrative water quality violations constitutes a violation of a condition or limitation of NPDES permit No. IN0000337 and Section 301 of the CWA, 33 U.S.C. § 1311, and is actionable under Section 505 of the CWA, 33 U.S.C. § 1365(a)(1).

138.    Pursuant to Sections 309 and 505 of the CWA, 33 U.S.C. §§ 1319 and 1365, and 40 C.F.R. §§ 19.1-19.4, U.S. Steel is liable for injunctive relief and civil penalties of up to $37,500 per day for the violation that occurred between January 12, 2009 and November 2, 2015 and $52,414 per day for each of the three violations occurring after November 2, 2015. 33 U.S.C. §§ 1311, 1365; 40 C.F.R. §§ 19.1-19.4.

## **THIRD CLAIM FOR RELIEF**

### **Failures to Maintain Equipment or to Respond as Required to Permit Violations in Violation of the CWA**

139.    Paragraphs 1 through 138 are realleged and incorporated herein by reference.

140.    Pursuant to the 2016 permit, U.S. Steel "shall at all times maintain in good working order and efficiently operate all facilities and systems … for the collection and treatment which are installed or used by the permittee and which are necessary for achieving compliance with the terms and conditions of this permit."

141.    As described above, on at least six occasions, U.S. Steel failed to maintain properly the Midwest Plant to such a degree as to lead directly to violations of other permit limitations or conditions. *See ¶¶* 105–111.

142.    Pursuant to the 2016 permit, in the event of an unauthorized release or discharge, including any spill, leak or discharge of non-stormwater not authorized by the permit, U.S. Steel must "take all reasonable steps to minimize or correct any adverse impact to the environment resulting from noncompliance with the permit," including by conducting accelerated or additional monitoring to determine the nature and impact of the noncompliance.

143.    As described above, U.S. Steel failed to minimize the adverse impact of its October 2017 illegal chromium discharge by failing to perform appropriate additional monitoring for hexavalent chromium. *See ¶¶* 112–113.

144.    Each of U.S. Steel's six observed maintenance violations, as well as its additional failure to minimize the adverse impacts of its October 2017 total chromium violation, constitutes a violation of a condition or limitation of NPDES permit No. IN0000337 and Section 301 of the CWA, 33 U.S.C. § 1311, and is actionable under Section 505 of the CWA, 33 U.S.C. § 1365(a)(1).

145.     Because U.S. Steel must meet the maintenance obligations in NPDES permit No. IN0000337 at all times, U.S. Steel has been in violation of maintenance requirements continuously for the entire time period relevant to this Complaint, punctuated by the incidents alleged herein to have been caused by such ongoing maintenance failure.

146.     Pursuant to Sections 309 and 505 of the CWA, 33 U.S.C. §§ 1319 and 1365, and 40 C.F.R. §§ 19.1-19.4, U.S. Steel is liable for injunctive relief and civil penalties of up to $37,500 per day for each violation occurring from January 12, 2009 through November 2, 2015 and $52,414 per day for each violation occurring after November 2, 2015. 33 U.S.C. §§ 1311, 1365; 40 C.F.R. §§ 19.1-19.4.

## FOURTH CLAIM FOR RELIEF

### Failure to Report or Monitor in Violation of the Permit and the CWA

147.     Paragraphs 1 through 146 are realleged and incorporated herein by reference.

148.     According to U.S. Steel's DMRs, U.S. Steel incorrectly calculated the difference between daily maximum downstream and daily maximum upstream temperatures, which is required to be accurately reported under Part III.A.8 of both the 2011 permit and the 2016 permit, twenty times during the five-year statute of limitations period. *See* ¶¶ 117 & 121.

149.     According to U.S. Steel's DMRs, U.S. Steel failed to attach the certification statement for 2016 Q3 (July-September), which is required to be submitted under Special Condition [5] to Parts I.A.4-5 of the 2016 permit, which constitutes a permit violation during the five-year statute of limitations period. *See* ¶¶ 118 & 121.

150.     According to U.S. Steel's DMRs, U.S. Steel failed to report the quarterly monitoring results in the final month of 2012 Q4 (December) and 2013 Q2 (June), as required by

Part I.A.7 of the 2011 permit, which constitutes two permit violations during the five-year statute of limitations period. *See* ¶¶ 119 & 121.

151.    According to U.S. Steel's DMRs, U.S. Steel did not monitor for the pollutants Total Cyanide, Total Recoverable Zinc, Total Recoverable Chromium, Total Suspended Solids, and Oil & Grease for at least five consecutive days at Outfalls 204 and 304 in December 2016, making it impossible to comply with the five times per week monitoring requirement under Parts I.A.4-5 of the 2016 permit. This monitoring failure constitutes ten total permit violations—one for each pollutant at each Outfall. *See* ¶¶ 120 & 121.

152.    Each of U.S. Steel's thirty-three monitoring or reporting violations constitutes a violation of a condition or limitation of NPDES permit No. IN0000337 and Section 301 of the CWA, 33 U.S.C. § 1311, and is actionable under Section 505 of the CWA, 33 U.S.C. § 1365(a)(1).

153.    Pursuant to Sections 309 and 505 of the CWA, 33 U.S.C. §§ 1319 and 1365, and 40 C.F.R. §§ 19.1-19.4, U.S. Steel is liable for injunctive relief and civil penalties of up to $37,500 per day for each of the three violations occurring from January 12, 2009 through November 2, 2015 and $52,414 per day for each of the thirty violations occurring after November 2, 2015. 33 U.S.C. §§ 1311, 1365; 40 C.F.R. §§ 19.1-19.4.

## FIFTH CLAIM FOR RELIEF

### Stormwater Routing in Violation of the Permit and the CWA

154.    Paragraphs 1 through 153 are realleged and incorporated herein by reference.

155.     Pursuant to the 2016 permit, certain stormwater management practices that the 2011 permit authorized are currently disallowed. Specifically, the 2016 permit no longer allows Outfall 004 to discharge stormwater runoff, whereas the 2011 permit allowed for stormwater discharges to be routed through Outfall 004.

156.     The fact sheet attached to the 2016 permit indicates that Outfall 004 continues to handle stormwater runoff from over twenty-five acres of industrial property. If the Midwest Plant is continuing to route stormwater through Outfall 004, then U.S. Steel has been committing ongoing permit violations every day—or at least every rainy day on which it has discharged stormwater—since the issuance of the 2016 permit.

157.     Each of U.S. Steel's potential stormwater violations constitutes a violation of NPDES permit No. IN0000337 and Section 301 of the CWA, 33 U.S.C. § 1311, and is actionable under Section 505 of the CWA, 33 U.S.C. § 1365(a)(1).

158.     Pursuant to Sections 309 and 505 of the CWA, 33 U.S.C. §§ 1319 and 1365, and 40 C.F.R. §§ 19.1-19.4, U.S. Steel is liable for injunctive relief and civil penalties of up to $52,414 per day for each violation occurring after November 2, 2015. 33 U.S.C. §§ 1311, 1365; 40 C.F.R. §§ 19.1-19.4.

## **PRAYER FOR RELIEF**

WHEREFORE, The Surfrider Foundation respectfully requests that this Court:

A.     Declare that U.S. Steel is in violation of the CWA and NPDES permit No. IN0000337;

B.     Enjoin U.S. Steel from discharging pollutants from its facility into Burns Waterway unless and only to the extent authorized by NPDES permit No. IN0000337;

C.      Order U.S. Steel to complete expeditiously all actions necessary to ensure that it complies with its permits and all applicable requirements of the CWA;

D.      Order U.S. Steel to pay a civil penalty to the United States for each violation that occurred during the five-year statute of limitations period, and for each subsequent violation until the company achieves compliance or until this suit is resolved, pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d); 28 U.S.C. § 2461; and 40 C.F.R. §§ 19.1–19.4;

E.      Award The Surfrider Foundation its costs of litigation, including attorney and expert fees, pursuant to Section 505(d) of the CWA, 33 U.S.C. § 1365(d); and

F.      Grant such other relief as the Court may deem appropriate.

DATED this 17th of January 2018.

Respectfully submitted,

By:     /s/ Mark N. Templeton
        Mark N. Templeton
        Robert A. Weinstock
        Abrams Environmental Law Clinic
        University of Chicago Law School
        6020 S. University Ave.
        Chicago, IL 60637
        (773) 702-9611
        templeton@uchicago.edu
        rweinstock@uchicago.edu

        Legal counsel for:

        The Surfrider Foundation
        Mailing address:
        P.O. Box 6010
        San Clemente, CA 92674
        Physical address:
        942 Calle Negocio, Suite 350
        San Clemente, CA 92673