**Exhibit A**

 THE UNIVERSITY OF **CHICAGO**    ABRAMS ENVIRONMENTAL LAW CLINIC AT THE UNIVERSITY OF CHICAGO LAW SCHOOL

November 13, 2017

BY CERTIFIED MAIL

United States Steel Corporation
Corporate Headquarters
600 Grant Street
Pittsburgh, PA 15219

Corporation Services Company
135 North Pennsylvania Street
Suite 1610
Indianapolis, IN 46204

U.S. Steel Corporation – Midwest Plant
One North Broadway Mail Station 70
Gary, IN 46402

**RE:    Notice of Intent to Sue for Violations of the Clean Water Act**

To Whom It May Concern:

I write on behalf of the Surfrider Foundation, whose members and supporters reside and recreate near the U.S. Steel Corporation – Midwest Plant in Portage, Indiana. The facility discharges its wastewater into the Burns Waterway, a small industrial ditch which empties directly into Lake Michigan. Members and supporters of the Surfrider Foundation recreate in the area of Lake Michigan directly adjacent to the Burns Waterway and are adversely affected by pollution from the U.S. Steel Corporation – Midwest Plant. This letter constitutes the Surfrider Foundation's notice of intent to sue for violations of the Clean Water Act resulting from the facility's operation in violation of the law. The violations upon which this notice letter is based are set forth more fully below.

The Indiana Department of Environmental Management (IDEM) issued National Pollutant Discharge Elimination System (NPDES) permit No. IN0000337 to the U.S. Steel Corporation – Midwest Plant. The permit establishes effluent limits for wastewater discharges from the facility, provides qualitative standards for the character of discharges, requires regular monitoring of discharges, and establishes maintenance standards for the facility. Any discharges in excess of these limitations or standards constitute violations of Sections 301(a) and 402(2) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1342(a). Section 505(a) of the Clean Water Act empowers citizens to bring suit to enforce all conditions of a NPDES permit. 33 U.S.C. § 1365(a). The violations detailed in this notice letter include violations of Permit No.

IN0000337, dated January 31, 2011, as well as the updated version of that Permit, which went into effect on March 30, 2016.

Based on publicly available discharge monitoring reports and other publicly available information, we have reason to believe that U.S. Steel has repeatedly violated, and will continue to violate, §§ 301(a) and 402(a) of the federal Clean Water Act and NPDES permit No. IN0000337. The U.S. Steel Corporation – Midwest Plant has routinely violated the conditions of its permit, in terms of both discharge limits and facility maintenance. Most egregiously, on April 10 and 11, 2017, according to IDEM reports, poor facility maintenance allowed for the illegal discharge of approximately 350 pounds of total chromium—over 10 times the daily maximum limit for total chromium—a discharge comprised predominantly of nearly 300 pounds of hexavalent chromium—hundreds of times more than the daily maximum limit for hexavalent chromium. This incident led to closures of public drinking water intakes and public beaches, including the Indiana Dunes National Lakeshore, that are frequented by the Surfrider Foundation's members and supporters. Further, the Midwest Plant has violated its permit limits regarding chromium discharges within the past month. According to an October 31, 2017 letter from U.S. Steel to IDEM, during a 24-hour period extending from October 25 to October 26, 2017, the total chromium loading from Outfall 304 was 56.7 lbs/day, approximately twice the daily maximum limit. The specific details of the facility's repeated violations are discussed below.

I.      **Permit Limits and Standards**

Within the last five years, U.S. Steel's Midwest Plant has been governed by two different permits entitled NPDES Permit No. IN0000337 and issued by the Indiana Department of Environmental Management. The first went into effect on January 31, 2011, and the second replaced this earlier permit on March 30, 2016.  NPDES Permit No. IN0000337 includes the following relevant limits.

   **A. Quantitative Limits:**

*Total Recoverable Chromium:*
- Both permits impose a daily maximum quantity of 30 lbs/day of total recoverable chromium discharges from Outfall 304.
- The 2016 permit imposes a monthly average rate of 10 lbs/day of total recoverable chromium discharges from Outfall 304.

*Hexavalent Chromium:*
- Both permits impose a daily maximum quantity of 0.51 lbs/day of hexavalent chromium from Outfall 304.
- The 2016 permit imposes a monthly average quantity of 0.17 lbs/day of hexavalent chromium discharges from Outfall 304.

*Oil and Grease:* Both permits impose a daily maximum quantity of 765 lbs/day of oil and grease discharges from Outfall 304.

*Temperature:*
- *Temperature Rise:* The 2011 and the 2016 permits each mandate that "there shall be no rise in the temperature in Portage-Burns Waterway of greater than 2 °F, as determined from upstream temperature and downstream temperature at the edge of the mixing zone."
- *Winter Maximum Temperature:* Both permits further require that during the months of December through March, the downstream temperature at the edge of the mixing zone may not exceed the maximum limit for the month by more than 3 °F at any time. The relevant monthly maximums here are: January 50 °F, February 50 °F, March 60 °F, and December 57 °F.
- *Spring, Summer and Fall Maximum Temperature:*
  o During the months of April through November, the downstream temperature may not exceed the limit for each month (subject to the below exceptions). For April, May, September, October, and November, the limit for each month (subject to the below exceptions) is 65 °F; for June, July, and August, the limit for each month is 70 °F.
  o The 2011 permit allows an exception to the above April-through-November limits when the upstream temperature equals or exceeds the maximum limitation for that day.
  o The 2016 permit allows an exception to the above April-through-November limits when "the upstream temperature is within 2 °F of the maximum limitation for that day." This exception allows downstream temperatures that exceed the limit for the month as long as the downstream temperature is within 2 °F of the maximum limitation for that day.
- The 2 °F temperature-rise limitation and the monthly maximum-temperature limits are each imposed to assure that thermal discharges from the U.S. Steel facility neither cause nor contribute to adverse effects upon aquatic life, injury to fish, wildlife or other aquatic life, or other environmental harms in the Burns Waterway and in Lake Michigan.

*Whole Effluent Toxicity Tests:* Both permits require U.S. Steel to conduct quarterly bioassay tests on model organisms to monitor the toxicity of the discharge from Outfall 004. If the effluent exceeds 1.5 chronic toxic units ($TU_c$) during the tests on *Ceriodaphnia dubia*, this is considered to demonstrate chronic toxicity and constitutes a failure of the toxicity test. Clean Water Act § 101(a)(3) prohibits the "discharge of toxic pollutants in toxic amounts." 33 U.S.C. § 1251(a)(3).

**B. Narrative Water Quality Limits:**

Both permits include sections reflecting applicable "Narrative Water Quality Standards" which mandate that the U.S. Steel facility's "[d]ischarge … shall not cause receiving waters … to contain substances, materials, floating debris, oil, scum or other pollutants … that are in amounts sufficient to be unsightly or deleterious …[or] that produce color, visible oil sheen, odor, or other conditions in such degree as to create a nuisance." The discharge must also not be "in amounts sufficient to be acutely toxic to, or to otherwise severely injure or kill aquatic life, or other animals, plants, or humans." Outside the mixing zone, the discharge must not contain "substances in concentrations which . . . are believed to be sufficient to injure, be chronically toxic to, or be carcinogenic, mutagenic, or teratogenic to humans, animals, aquatic life, or plants."

**C. Monitoring and Reporting Requirements:**

*Five Times per Week Monitoring:*
- The 2011 permit requires that the facility monitor discharge from Outfalls 104, 204, and 304 five times per week for the following parameters: flow, total suspended solids (TSS), oil and grease, total chromium, zinc, total cyanide, and pH level. (Note: pH level is not monitored at Outfall 304.)
- The 2016 permit requires that the facility monitor discharge of flow, oil and grease, and pH from Outfall 004—as well as the discharge of flow, TSS, oil and grease, total chromium, zinc, and total cyanide from Outfalls 104, 204 and 304—five times per week.

*Quarterly Monitoring:*
- The 2011 permit requires that the facility discharge storm water only through Outfalls 001, 102 and 103. The facility must monitor these three storm-water outfalls on a quarterly basis.
- The 2016 permit requires that the facility monitor discharges of TSS, Chemical Oxygen Demand (COD), Ammonia, and Zinc from Outfalls 002 and 003 on a quarterly basis.

*Whole Effluent Toxicity Tests:* Both permits require the whole effluent toxicity tests take place quarterly, except where this schedule is superseded by the Toxicity Reduction Evaluation Schedule of Compliance that is implemented following the demonstration of toxicity.

*Total Toxic Organics:* Both permits require U.S. Steel to either test for total toxic organics (TTO) on a quarterly basis or to submit a certification statement with specified language.

*Signatory and Certification Requirements:* Both permits require that a responsible corporate officer or their duly authorized representative sign and certify all reports. The certification must include specified language.

*Changes in Discharge of Toxic Substances:* Both permits require that U.S. Steel "notify the Commissioner as soon as it knows or has reason to believe: That any activity has occurred or will occur which would result in the discharge, on a routine or frequent basis, of any pollutant identified as toxic . . . which is not limited in the permit, if that discharge will exceed the highest of the following 'notification levels'": 100 micrograms/liter or 5 times the maximum concentrated value reported for that pollutant in the permit application.

### D. Maintenance Standards:

*Good Housekeeping:* Both permits require U.S. Steel to "keep clean all exposed areas that are potential sources of pollutants." The good housekeeping program must "include a cleaning and maintenance program for all impervious areas of the facility where particulate matter, dust, or debris may accumulate."

*Maintenance:* Both permits include "Proper Operation and Maintenance" requirements that mandate that "[t]he permittee shall at all times maintain in good working order and efficiently operate all facilities and systems (and related appurtenances) for the collection and treatment which are installed or used by the permittee and which are necessary for achieving compliance with the terms and conditions of this permit." Additionally, "nonstructural control measures must also be diligently maintained . . . . If control measures need to be replaced or repaired, [U.S. Steel must] make the necessary repairs or modifications as expeditiously as practicable."

*Corrective Actions:* Both permits mandate that in the event of an unauthorized release or discharge, including any spill, leak or discharge of non-storm water not authorized by the permit, U.S. Steel must "review and revise the selection, design, installation, and implementation of [its] control measures" to ensure that the condition is eliminated and will not be repeated. U.S. Steel is further required to "take all reasonable steps to minimize or correct any adverse impact to the environment resulting from noncompliance with the permit."

### E. Storm Water Conditions:

*Outfall 004:* The 2016 permit allows U.S. Steel to discharge only "process waste water from internal outfalls 104 and 204" through Outfall 004. The permit does not authorize the discharge of storm water from Outfall 004 or from internal outfalls 104 or 204.

*Storm Water Management:* The permit includes provisions for storm-water management. Relevant sections of the permit include Part 1(C) ("Maintenance") and Parts 1(D)(4)(d)(2) and (D)(4)(d)(3) ("Spill Prevention and Response Procedures"). The permit requires both "[p]reventive measures such as barriers between material storage and traffic areas, secondary containment provisions, and procedures for material storage and handling" and "[p]rocedures for expeditiously stopping, containing, and cleaning up leaks, spills, and other releases." These provisions are designed to ensure that industrial processes do not contaminate storm-water runoff.

## II.   Violations

### A.   Violations of Quantitative Limits

There have been numerous violations of quantitative limits set in the facility's NPDES permit within the last five years, as demonstrated by monitoring data reported by U.S. Steel in its monthly Discharge Monitoring Reports (DMRs).  Each of the exceedances represents a violation of the federal Clean Water Act, 33 U.S.C. § 1311(a), and NPDES Permit No. IN0000337. The below table documents self-reported limits violations.

| Discharge Type | Date(s) of Violation | Outfall | Measured Value | Type of Allowance | Permit Allowance |
|---|---|---|---|---|---|
| Chromium, Total Recoverable | 02/03/2013 | 304A | 36.17 lbs/day[1] | Daily maximum | 30 lbs/day |
| Whole Effluent Toxicity, Chronic – C. dubia | Week of 08/04/2013 | 004 | 2.0 TUc | Quarterly maximum | 1.5 TUc (100/IC25) |
| Temperature, Downstream | 05/26/2014 | 500A | 65.66°F | Daily maximum | 65°F |
| Temperature, Downstream | 05/27/2014 | 500A | 65.37°F | Daily maximum | 65°F |
| Temperature, Downstream | 05/29/2014 | 500A | 66.25°F | Daily maximum | 65°F |
| Whole Effluent Toxicity, Chronic – C. dubia | Week of 06/08/2014 | 004 | 2.9 TUc (100/NOEC) / 2.3 TUc (100/IC25) | Quarterly maximum | 1.5 TUc (100/NOEC) / 1.5 TUc (100/IC25) |
| Whole Effluent Toxicity, Chronic – C. dubia | Week of 06/22/2014 | 004 | 2.9 TUc (100/NOEC) / 1.6 TUc (100/IC25) | Quarterly maximum | 1.5 TUc (100/NOEC) / 1.5 TUc (100/IC25) |
| Temperature, Downstream | 06/02/2014 | 500A | 71.11°F | Daily maximum | 70°F |
| Temperature, Downstream | 06/03/2014 | 500A | 70.64°F | Daily maximum | 70°F |
| Temperature, Downstream | 09/15/2014 | 500A | 66.65°F | Daily maximum | 65°F |

| | | | | | |
|---|---|---|---|---|---|
| Temperature Difference Receiving Water | 10/01/2014 | 500A | 7.55°F | Daily rise | 2°F |
| Temperature, Downstream | 10/02/2014 | 500A | 66.73°F | Daily maximum | 65°F |
| Oil & Grease | 03/19/2015 | 304A | 848 lbs/day | Daily maximum | 765 lbs/day |
| Temperature, Downstream | 10/07/2015 | 500A | 65.6°F | Daily maximum | 65°F |
| Temperature, Downstream | 10/08/2015 | 500A | 65.6°F | Daily maximum | 65°F |
| Temperature, Downstream | 10/09/2015 | 500A | 65.1°F | Daily maximum | 65°F |
| Temperature, Downstream | 10/10/2015 | 500A | 65.4°F | Daily maximum | 65°F |
| Temperature, Downstream | 10/22/2015 | 500A | 65.7°F | Daily maximum | 65°F |
| Temperature, Downstream | 10/23/2015 | 500A | 65.5°F | Daily maximum | 65°F |
| Temperature Difference Receiving Water | 09/07/2016 | 500A | 2.1°F | Daily rise | 2°F |
| Temperature Difference Receiving Water | 11/02/2016 | 500A | 2.1°F | Daily rise | 2°F |
| Chromium, Hexavalent | 01/12/2017 | 304A | 2.371 lbs/day | Daily maximum | 0.51 lbs/day |
| Temperature, Downstream | 02/26/2017 | 500A | 53.35°F | Daily maximum | 50°F |
| Temperature, Downstream | 02/27/2017 | 500A | 53.93°F | Daily maximum | 50°F |
| Temperature, Downstream | 02/28/2017 | 500A | 54.54°F | Daily maximum | 50°F |
| Chromium, Total Recoverable | 04/10/2017 | 304A | 138.8 lbs/day | Daily maximum | 30 lbs/day |
| Chromium, Total Recoverable | 04/11/2017 | 304A | 204.0 lbs/day | Daily maximum | 30 lbs/day |

| Chromium, Total Recoverable | April 2017 | 304A | 13.97 lbs/day | Monthly average maximum | 10 lbs/day |
| Chromium, Hexavalent | 04/11/2017 | 304A | 902.8 lbs/day[2] | Daily maximum | 0.51 lbs/day |
| Chromium, Hexavalent | 04/12/2017 | 304A | 1.782 lbs/day | Daily maximum | 0.51 lbs/day |
| Chromium, Hexavalent | April 2017 | 304A | 50.26 lbs/day | Monthly average maximum | 0.17 lbs/day |
| Chromium, Total Recoverable | 10/25/2017 | 304A | 56.7 lbs/day | Daily Maximum | 30 lbs/day |

[1] This amount was reported by U.S. Steel in the narrative cover letter it appended to its DMR submission. The DMR data that U.S. Steel reported for this day was 34.37 lbs/day.

[2] This figure was submitted by U.S. Steel in its April 2017 DMR data. U.S. Steel staff attested to the accuracy of this figure in certifying its submission. Nonetheless, U.S. Steel stated in a footnote that this figure represented "an absurd result" of the mathematical formula required by the permit. According to other reports U.S. Steel submitted to IDEM, during April 11 and 12, 2017, the facility released a total of approximately 346 lbs. of total chromium, approximately 298 lbs. of which was hexavalent chromium. The DMR data reflects that a significant portion of the overall amount of total chromium was discharged on April 10; at the same time, the DMR also reflects no discharge of hexavalent chromium on that date.

**B. Violations of Qualitative Limits**

In addition to violations of quantitative limits, the U.S. Steel Corporation — Midwest Plant has also violated the qualitative water quality standards in its permit. Violations occurred during, preceding, and following the events of April 10 and 11, 2017. On the morning of April 11, 2017, U.S. Steel reported a bluish-green color in the effluent from Outfall 004. Photographs from that morning show substantial discoloration of effluent. Additionally, as reported in the relevant monthly DMRs and other reports made by U.S. Steel to IDEM, effluent discoloration was also observed once in December 2013 and twice in April 2016. In all three cases prior to the April 10 and 11, 2017 incident, U.S. Steel reported white or cloudy discoloration observed at Outfall 004, and in all three cases, IDEM noted these events as violations.

The April 10 and 11, 2017 discharge of hexavalent chromium also constitutes a violation of the permit condition forbidding water "outside the mixing zone, to contain substances in concentrations which on the basis of available scientific data are believed to be sufficient to injure, be chronically toxic to, or be carcinogenic, mutagenic, or teratogenic to humans, animals,

aquatic life, or plants." The United States Environmental Protection Agency's Final Removal Report for this incident describes observed concentrations of hexavalent chromium outside of the mixing zone as potentially harmful to human health.

Based on publicly available data, the U.S. Steel Corporation – Midwest Plant appears to have failed to meet the maintenance obligations set forth in the permit. These maintenance problems appear to have led to the large chromium and hexavalent chromium discharge of April 10 and 11, 2017, and that incident is but the most dramatic in a series of events.

Photographs taken immediately after the April 10 and 11, 2017 incident show extensive corrosion that allowed for the unpermitted discharge. The IDEM inspection report following the April 10 and 11 incident rated the facility's "Operations and Maintenance" as "unsatisfactory" because of the equipment failure that led to the re-routing of toxic wastewater. Additionally, IDEM's post-incident inspection rated "flow measurement" as "marginal" due to potential obstructions in the channels of two of the facility's outfalls.

These recent maintenance violations follow on the heels of several other similar violations, as detailed in U.S. Steel's reports to IDEM. In April 2012, wastewater was incorrectly routed such that it was not properly treated and was discharged without permission. In February 2013, when the Midwest Plant exceeded its chromium discharge limit, equipment failure and malfunctioning controls allowed for the excessive discharge. In March 2015, the plant exceeded its allowance for oil and grease discharge because of a loss of oil processing capabilities that led, according to U.S. Steel's report, to "accumulation" of oil "during the prior week" that was either not detected or not adequately addressed. In two separate but related events in April 2016, leaking Morg oil was not properly contained and instead mingled with non-contact cooling water, leading to the discharge of untreated oil-contaminated water.

A consistent and continuing pattern appears to emerge from these incidents. Water flowed into the wrong treatment processes or was diverted from treatment altogether. Failure to monitor and manage systems seems to have delayed corrective action and led to and/or exacerbated discharge limits violations. This pattern suggests that the problem is not rare breakdowns of single pieces of equipment but an ongoing failure to maintain plant facilities.

Besides the above-noted violations of the maintenance conditions of its permits, the U.S. Steel Corporation – Midwest Plant appears to be violating permit conditions relating to storm-water management.

The renewed 2016 permit does not allow certain storm-water management practices that the 2011 NPDES permit authorized. Specifically relevant here, the 2011 permit allowed Outfall 004 to handle storm water, whereas the current 2016 permit no longer authorizes the use of Outfall 004 for that purpose. However, the fact sheet attached to the 2016 permit indicates that Outfall 004 continues to handle storm-water runoff from over 25 acres of industrial property. If the facility is continuing to route storm water through Outfall 004, then U.S. Steel may have

been committing ongoing permit violations every day (or at least every rainy day that it has discharged storm water) since the issuance of the 2016 permit.

It also appears that U.S. Steel ceased quarterly reporting of Outfall 001S in March 2015– a time when the 2011 permit still required this reporting. Data that we have reviewed does not explain this discrepancy.

**C. Reporting and Monitoring Violations**

Lastly, the U.S. Steel Corporation – Midwest Plant has repeatedly violated the monitoring and reporting requirements contained within its permit. The below table lists reporting violations for the facility during the past five years.

| Discharge Type | Date(s) of Violation | Outfall | Description of Violation | Type of Violation |
|---|---|---|---|---|
| | December 2012 | | No quarterly testing was conducted in this month | Not conducted as required |
| | June 2013 | | Required quarterly testing data missing | Not reported as required |
| Temperature | 10/01/2014 | 500A | 7.55 °F temperature difference reported as a 2 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/06/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/07/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/09/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/10/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/15/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/16/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/20/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/21/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 01/22/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 04/23/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |

| Temperature | 04/24/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
|---|---|---|---|---|
| Temperature | 06/07/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 06/09/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 06/22/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 06/26/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 06/28/2016 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 08/19/16 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 08/20/16 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Temperature | 08/21/16 | 500A | 2 °F difference reported as 1 °F difference | Incorrectly calculated temperature difference |
| Total Toxic Organics | October 2016 | | Missing Total Toxic Organic Certification | |
| Total Suspended Solids, Oil & Grease, Cyanide, Zinc, Cyanide, and Chromium | December, 2016 | 204A, 304A | Inadequate monitoring frequency (should be 5/week)<br><br>* Note: this constitutes twelve independent monitoring violations as each pollutant must be monitored at each outfall. | 5 days in a row without tests (6 days for cyanide) |

In addition to the above table, most of the quantitative temperature violations noted in the Quantitative Violations table are not acknowledged as violations in the self-reported DMR data. U.S. Steel has also submitted inconsistent values for daily maximum total recoverable chromium on 02/03/2013 in its DMR data and its certification page. (See above Table of Quantitative Violations footnote 1.) Based on a review of publicly available documents, primarily U.S. Steel's DMR submissions, U.S. Steel's lack of documentation of these violations and apparent failure to explain how the facility will prevent similar violations from reoccurring appear to constitute additional reporting violations.

In conclusion, this letter provides notice of the Surfrider Foundation's intent to file a federal enforcement action under the authority of the Clean Water Act's citizen-suit provision, 33 U.S.C. § 1365(a), to secure appropriate relief for these violations. The Surfrider Foundation

seeks to improve water quality in Lake Michigan by securing long-term compliance with applicable law.

This notice letter is based on publicly available information. Additional information, including information in U.S. Steel's possession, may reveal additional violations. This letter addresses publicly identifiable violations occurring within five years immediately preceding the date of this notice letter.

Should you or your attorney wish to discuss this matter, please feel free to contact me at the address and phone number listed below.

Sincerely,

Mark N. Templeton, Esq., Director
Robert A. Weinstock, Esq., Fellow
Abrams Environmental Law Clinic
University of Chicago Law School
6020 S. University Ave.
Chicago, Illinois 60637
(773) 702-9611
templeton@uchicago.edu
rweinstock@uchicago.edu

Legal counsel for:

The Surfrider Foundation
P.O. Box 6010
Suite 350
San Clemente, CA 92673

Cc:

Scott Pruitt, Administrator
U.S. Environmental Protection Agency
Mail Code 1101A
1200 Pennsylvania Ave. N.W.
Washington, D.C. 20460

Bruno L. Pigott, Commissioner
IDEM Central Office
Indiana Government Center North
100 North Senate Avenue
Indianapolis, IN 46204

Robert Kaplan, Acting Regional
Administrator
U.S. Environmental Protection Agency,
Region 5
77 W. Jackson Blvd.
Chicago, IL 60604

Curtis T. Hill, Indiana Attorney General,
Office of the Indiana Attorney General
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204